OPINION OF THE COURT
Mario J. Rossetti, J.
Defendant has been indicted for grand larceny in the first degree and has moved to dismiss the indictment on the grounds that (a) there was insufficient evidence before the Grand Jury, and the indictment fails to state an offense; (b) prosecution of defendant on the indictment would violate defendant’s right to due process of law; (c) the Grand Jury proceedings were defective within the meaning of GPL 210.35; (d) the indictment is the result of selective enforcement and prosecution; (e) the Attorney General’s Medicaid Fraud Control Unit has no jurisdiction with respect to this matter; and (f) the interests of justice warrant dismissal of the indictment. This decision will focus on the first facet of defendant’s motion to dismiss.
The court has reviewed the evidence presented to the Grand Jury in the light most favorable to the People. This evidence established that defendant was a radiation oncologist employed by Roswell Park Cancer Institute (Roswell Park or RPCI). Also, that Roswell Park entered into an arrangement with Women’s Christian Association Hospital (WCA) in Jamestown, New York, whereby Roswell Park agreed that defendant, as part of his duties at Roswell Park, would travel periodically to WCA to provide quality assurance for radiation therapy. While at WCA the defendant was offered a position as their Medical Director, *753 which he accepted and was paid an annual salary of $24,000. Defendant did not report this income to Roswell Park until 1997. In 1993, the defendant started a company known as Jamestown Radiation Oncology Group (JROG). Also in 1993, WCA entered into a contract with JROG for the treatment of patients. The defendant did not inform Roswell Park that he owned such a company nor did he report any income generated by JROG to Roswell Park.
To fully understand the nature of this prosecution, familiarity with Public Health Law § 206 (14) and the “Practice Plan” is necessary. As of July 1, 1993, the State Legislature, under Public Health Law § 206 (14), authorized establishment of the Practice Plan by the State Health Commissioner as a means toward ensuring that the salaries and benefits for State-employed physicians at Roswell Park would remain competitive with that of physicians who are employed by private institutions. Public Health Law § 206 (14) authorizes the Commissioner of Health to establish a plan for the collection and disbursement of clinical practice income resulting from the clinical practice of licensed health professionals employed by Roswell Park. Pursuant to this legislative authority, the Department of Health promulgated 10 NYCRR subpart 88-4, which provides that all Roswell Park physicians who perform the clinical practice of medicine are members of the Practice Plan (10 NYCRR 88-4.3 [b] [1] [i]). The regulations also require that all billing for professional services provided by members of the Practice Plan be done by the Practice Plan (10 NYCRR 88-4.3 [b] [3]). The revenues generated through billings by the Practice Plan for professional service provided by its members are used to supplement the State-funded salary of Practice Plan members, and to provide benefits, such as malpractice insurance, disability insurance, and enhanced retirement programs, to its members.
Under the procedures established by the Practice Plan, a member may be assigned to provide professional services at a facility or institution outside of Roswell Park as part of the duties for which he or she is being paid at Roswell Park. Even in that event, the Practice Plan is entitled to bill the outside employing entity for the professional services of the assigned member. Practice Plan members who wish to bill separately for professional services cannot do so unless the Chief Executive Officer (CEO) and governing board of Roswell Park have approved separate billing. Absent such approval, Practice Plan members may not bill separately for outside professional ser *754 vices (10 NYCRR 88-4.3 [b] [3]), and “In no event shall individual practice plan members or associate plan members be permitted to bill directly for fees for clinical practice at or through RPCI.” (10 NYCRR 88-4.3 [d] [6].)
Practice Plan membership can be terminated “for cause” when a Practice Plan member’s clinical privileges or medical staff membership have been suspended or terminated in writing by the CEO for reasons described in the paragraph after an internal RPCI hearing, if requested, pursuant to the RPCI medical staff by-laws (10 NYCRR 88-4.3 [b] [4]). For the purpose of the regulations, Practice Plan membership shall be terminated if the suspension was for grave cause, including gross professional incompetence; serious malfeasance, misfeasance or nonfeasance; serious and protracted medical disability; misconduct in office; and felony or other serious criminal offense. Nowhere in the rules and regulations is there a provision suggesting that a violation of the regulation can result in criminal prosecution.
The specific allegations of the indictment read as follows:
“The Defendant, Kyu H. Shin, between about July 1, 1993 and September 31, 1997, in the County of Erie, State of New York, with intent to deprive another of property and to appropriate the same to himself, wrongfully took, obtained, and withheld property valued in excess of $1,000,000.00 from an owner thereof, in that:
“The defendant, while a member of the Practice Plan at Roswell Park Cancer Institute, withheld and converted to his own use and others clinical practice income which he knew was the property of the Practice Plan.” (Emphasis added.)
The People allege that the larceny occurred when defendant withheld “property” in the form of his WCA earnings and JROG revenues from the Practice Plan. The defendant, however, contends, first, that a prosecution cannot be grounded upon a violation of Public Health Law § 206 (14), a civil statute, and secondly, that the evidence is legally insufficient to support the crime charged.
The issues which will be addressed by this court are, preliminarily, whether or not the People can base a larceny upon the violation of Public Health Law § 206 (14), and secondly, even if they can, whether or not the facts of this case constitute such a violation.
The court will first address whether or not defendant’s alleged failure to report and submit his outside income to the *755 Practice Plan, even if supported by legally sufficient evidence, can be prosecuted as a Penal Law larceny.
Clearly, 10 NYCRR 88-4.3 (b) (3) and (d) (6) require defendant to report his outside income and his failure to so report constitutes a violation of Public Health Law § 206 (14) and the Practice Plan. It is also clear that any income constituting “clinical practice income” would have to be paid into the Practice Plan. The purposes and objectives of Public Health Law § 206 (14) and the Practice Plan, as outlined earlier, however, are manifestly civil in nature. Although defendant’s conduct may have violated the statute’s civil purposes, as stated in People v Foster (73 NY2d 596, 603-604), “Conduct which is wrongful in the civil context is not necessarily ‘wrongful’ within the meaning of the larceny statutes (People v Yannett, 49 NY2d 296, 302; People v Yonkers Constr. Co., 17 NY2d 322, 337).” Foster cautioned that “[t]he courts and the Legislature have been reluctant to elevate civil wrongs to the level of criminal larceny (People v Keeffe, 50 NY2d 149, 159; People v Ryan, 41 NY2d 634, 641), particularly when the conduct arises out of legitimate business activities where there are often close questions as to whether the defendant acted intentionally or was merely incompetent (People v Churchill, 47 NY2d 151, 157).” (People v Foster, at 604.)
Although the question herein is not one of intentional versus incompetent conduct, Foster’s admonishment must be carefully considered. Under this indictment the People are attempting to prosecute defendant for a violation of a statute containing no criminal sanctions and no reference to criminal sanctions. Without this civil statute defendant’s alleged conduct could not in any way constitute a Penal Law larceny.
In most analogous situations, when the Legislature intends to impose criminal sanctions for violation of a non-Penal Law statute, its intent to do so is clear (see, People v Valenza, 60 NY2d 363). For example, section 1806 of the Tax Law states that “Any person who willfully fails to collect any withholding tax as required by article twenty-two of this chapter * * * shall, in addition to other penalties provided by law, be guilty of a misdemeanor” (Tax Law § 1806 [a]); article 3-A of the Lien Law, which imposes on a contractor a fiduciary duty over funds received for the improvement of real property {see, Lien Law §§ 70, 71, 71-a), states that when a “trustee of a trust arising under this article” misappropriates trust funds, he may be “guilty of larceny and punishable as provided in the penal law” (Lien Law § 79-a [1]; see, People v Chesler, 50 NY2d 203); the *756 Environmental Conservation Law provides that “ ‘[n]o provision or language of the Fish and Wildlife Law [11-0101 et seq.; 13-0101 et seq.] shall be construed as amending, repealing, superseding or limiting any provision of the Penal Law’ ” (Matter of Thomas RR., 64 NY2d 1062, 1064). Public Health Law § 206 (14) and 10 NYCRR subpart 88-4, in significant distinction to these noted non-Penal Law statutes, contain no analogous reference to any Penal Law sanctions for failure to comply with the statutory requirements.
It is also important to note that 10 NYCRR 88-4.3 fully addresses discipline of Practice Plan members in subdivision (b) (4), which provides for termination of Practice Plan membership “for cause.” Such termination can be imposed when a Practice Plan member’s clinical privileges or medical staff membership have been suspended or terminated in writing by the CEO for reasons described in the paragraph after an internal RPCI hearing, if requested, pursuant to the RPCI medical staff by-laws. It is apparent that 10 NYCRR 88-4.3 provides a fully integrated scheme for not only the collection and distribution of income, but also for the termination of membership in the Practice Plan as a sanction for any violations thereof, without any reference to possible Penal Law sanctions. As such, the statute manifests a legislative intention to make Public Health Law § 206 (14) and 10 NYCRR 88-4.3 (b) (4) the exclusive means of sanctioning violations of membership in the Plan and, without any indication of a legislative intent to otherwise impose criminal sanctions, a Penal Law prosecution cannot lie (see, People v Valenza, supra; People v Lacay, 115 AD2d 450).
Courts have cautioned that we must be careful to construe provisions of the Penal Law “according to the fair import of their terms to promote justice and effect the objects of the law” (Penal Law § 5.00) and to avoid extending criminal responsibility beyond the fair scope of the legislative mandate (see, People v P. J. Video, 68 NY2d 296, 308, cert denied 479 US 1091; People v Case, 42 NY2d 98, 101; People v Gottlieb, 36 NY2d 629, 632; People v Snow, 138 AD2d 217). Prosecution under the Penal Law larceny statute for a failure to report and submit income under Public Health Law § 206 (14) appears to be such an inappropriate extension. There being no manifest legislative intent to criminally prosecute someone who violates Public Health Law § 206 (14) and 10 NYCRR 88-4.3 under the Penal Law, but on the contrary to limit sanctions to the procedures contained in those provisions, a Penal Law prosecution does not have a basis in law and this indictment must be dismissed.
*757 Even if a Penal Law prosecution is authorized for a violation of Public Health Law § 206 (14), this particular indictment would have to be dismissed for failure to present legally sufficient evidence before the Grand Jury. The evidence presented to the Grand Jury would be legally sufficient to constitute the crime charged only if defendant’s income from WCA and JROG should have been included in the Practice Plan. To make that determination, a review of the applicable definitions is required.
The indictment alleges that defendant “withheld and converted to his own use and others clinical practice income which he knew was the property of the Practice Plan.” (Emphasis added.) A principle issue raised by the defendant is whether the income defendant derived from WCA and JROG was clinical practice income as defined in Public Health Law § 206 (14).
“Clinical practice income” is defined as “the income from fees for services of licensed health professionals rendered in connection with clinical practice.” (Public Health Law § 206 [14] [b] [ii].) “Clinical practice” means “providing all forms of medical and health care, including patient consultations, and performing clinical investigation involving patients, at or through Roswell Park Cancer Institute, for which acts a fee for professional service is customarily charged.” (Public Health Law § 206 [14] [b] [i] [emphasis added].)
Under the plain language of these definitions, the income belonged to the Practice Plan only if it was clinical practice income. It is “clinical practice income” only if it was earned “at or through” Roswell Park. The salient issue, therefore, is whether or not the income at issue was earned “at or through” Roswell Park.
The People contend that whether or not the income was earned “at or through” Roswell Park is a question of fact for a jury to determine. While this may be true in a civil contest (see, Kountz v State Univ., 53 AD2d 856, on remand 89 Misc 2d 483, revd 61 AD2d 835, on remand 109 Misc 2d 319, affd 87 AD2d 605, lv denied 58 NY2d 747, 602), it is inappropriate in the criminal context. The amount, nature and source of the income earned may well be questions of fact for a jury. But whether or not that income, even presuming the amount and source has been established by legally sufficient evidence, constitutes “clinical practice income”, is a question of law for this court. An analogy can be found in the Penal Law burglary statutes. A key element to committing a burglary is entry into *758 a premises or building. In People v King (61 NY2d 550), the question before the court was whether or not a defendant who reaches through a window of a premises has entered it within the meaning of the Penal Law. Whether or not the defendant had in fact reached through the window was a question of fact for the trial jury, but whether that act constituted an entry within the meaning of the Penal Law was a question of law which was determined affirmatively by the Court of Appeals. To permit a trial jury, or this Grand Jury, to determine whether or not defendant’s income from WCA and JROG constituted “clinical practice income” would be to confer upon them a judicial, and even a legislative function not intended by the Penal Law. A jury determines whether the factual elements of a crime have been established. It does not determine which factual elements are necessary to constitute the crime, nor does it determine the meaning of those statutory elements. The fact that before we can even address the issue as to whether or not the alleged conduct constitutes a larceny we must preliminarily determine whether or not it even violates the applicable civil statute, reasons against any legitimate criminal prosecution being based upon the ambiguous terms of a civil statute {see, People v Vetri, 309 NY 401).
At any rate, the evidence presented to this Grand Jury, when reviewed in the light most favorable to the People, established that JROG was a separate corporate entity created by defendant. It had no relationship with Roswell Park whatsoever. Although income derived from JROG should have been reported to the Practice Plan, it was not, as a matter of law, earned “at or through” Roswell Park and, therefore, cannot be considered “clinical practice income” and would not have to be paid into the Plan.
The income defendant earned from WCA obviously was not earned at Roswell Park. The only legal issue is whether or not it was earned “through” Roswell Park. Roswell Park’s only connection to WCA was that it sent defendant there to create goodwill and, hopefully, referrals. The income earned by defendant was paid by WCA for his services as their Medical Director, and not for anything he was doing on behalf of Roswell Park. This position was offered by WCA and the salary paid by WCA. Although Roswell Park placed defendant at WCA. for other purposes, there is nothing in Public Health Law § 206 (14) prohibiting defendant from accepting the position. Roswell Park’s placement of defendant at WCA may have afforded him the opportunity to be offered the position as Medical Director, *759 but the income earned, although it should have been reported, was not earned “through” Roswell Park.
Public Health Law § 206 (14) is a civil statute with a civil purpose. To attempt to anchor a criminal prosecution upon the statute, given the ambiguousness of its determinative terms, and the failure of the Legislature to clearly authorize á criminal prosecution for a violation thereof, is prone to abuse and unfairness. As stated in People v Valenza (60 NY2d 363, supra), there is great doubt on whether such authority has been bestowed on the prosecutor, and this court, without less ambiguous direction by the Legislature, will not recognize such a prosecution (People v Valenza, 60 NY2d, at 372).
Pursuant to the foregoing, defendant’s motion to dismiss the indictment is granted. Given this decision, the balance of defendant’s grounds for dismissal are rendered moot.