■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DERRICK BRAZZEAL, Appellant.—Appeal by the defendant from a judgment of the Supreme Court, Kings County (Kreindler, J.), rendered August 25, 1986, convicting him of murder in the second degree and criminal possession of a weapon in the second degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is reversed, on the law and as a matter of discretion in the interest of justice, and a new trial is ordered. No questions of fact have been raised or considered.

The defendant was convicted of murder in the second degree in connection with the death of Miles Gary Mitchell, a cab driver who had just prior to his death purchased a stolen video cassette recorder (hereinafter VCR) from a group of men among whom the defendant is alleged to have been included.

The primary prosecution witnesses were Ervin Charlton, who admittedly assisted two of the group members, Tarik Greene and Carlton Springer, in the theft of the VCR, and Greene himself. Although several of the errors asserted by the defendant on appeal have not been preserved for our review, and others would not, by themselves, warrant reversal, we conclude that, under the facts of this case, the combined effect thereof was so prejudicial as to have deprived the defendant of his right to a fair trial. Accordingly, reversal of the defendant's conviction is required.

At trial, Ervin Charlton testified that on the evening of January 28, 1985, he had acted as a lookout while Carlton Springer and Tarik Greene (who the witness referred to throughout his testimony as Tarik), broke into a house and took a VCR and a radio. He testified further that Greene then hailed a cab, and the trio went off to try and sell their ill-gotten gains. He continued that their first attempt proved unsuccessful, but the cab driver, having overheard their discussions, said he would buy the VCR for $150. According to Charlton, the cab driver thereupon proceeded to a bank, where he withdrew the needed funds from an automatic teller machine, and after the deal was completed and the driver was on his way to drop his passengers off at a nearby location, the trio noticed an acquaintance named Mousey walking by. Charlton testified that Mousey was in the company of a man whom he identified as the defendant. Charlton continued that Greene then told the cab driver to stop, and called Mousey over to the vehicle, that he and Springer were beginning to alight from the vehicle when Mousey and the defendant approached the taxi cab, and that he and Springer walked to the sidewalk while Greene, Mousey and the defendant stood around the taxi cab, talking. According to Charlton, Greene told Mousey that they had sold the VCR to the cab driver, whereupon Mousey opened the door and snatched the VCR, at which point, the defendant jumped into the cab, told the driver not to move, and then shot him.

On cross-examination, Charlton admitted having signed an agreement with the prosecutor whereunder he would be immunized from prosecution for both the burglary and the killing of the cab driver in exchange for his testimony. He was also confronted with the transcript of his Grand Jury testimony, wherein it was indicated that "Derrick", not "Tarik", was in the taxi with him and had called Mousey over when the cab driver stopped the vehicle. He stated that he must have gotten confused, and noted that he had never seen the

defendant before the incident and did not know that his name was "Derrick". The court reporter who transcribed Charlton's Grand Jury testimony testified that "Derrick" and "Tarik" are written similarly stenographically, and that she may have misheard Charlton's testimony.

Charlton's testimony constituted the primary evidence against the defendant. The only other alleged eyewitness to the shooting to testify on the People's behalf was Tarik Greene. From this testimony stems most of the prejudice suffered by the defendant. Greene indicated, outside the presence of the jury, that if he were called to testify he would invoke his Fifth Amendment right against self-incrimination. After much discussion, the prosecutor agreed to grant Greene full immunity and Greene thereafter testified before the jury that he did not see the cab driver being shot. At this point, the prosecutor was permitted to attempt to refresh Greene's recollection with two statements, one written but unsigned and one oral but unsworn, that he had allegedly previously made to law enforcement officials. Those statements were to the effect that he had seen a man named Sean run from the taxi cab after having heard a gunshot. At this juncture, the prosecutor also sought, albeit unsuccessfully, to introduce Greene's prior statements into evidence.

CPL 60.35 (1) permits a party to impeach his own witness with a prior inconsistent statement, but only when that prior statement is either in writing and signed by the witness or made under oath. However, such impeachment may not take place unless and until the witness in question "gives testimony upon a material issue of the case which tends to disprove the position" of the party who called the witness to testify. Here, Greene had merely testified, under a grant of immunity, that he did not see who shot the cab driver, when the prosecutor sought to introduce his prior statements into evidence. This was clearly improper, as Greene's testimony at that point had not tended to disprove the People's case (see, CPL 60.35 [1]; *People v Saez,* 69 NY2d 802; *People v Fitzpatrick,* 40 NY2d 44, 51). The prosecutor also improperly attempted, at this juncture, to use these prior statements to refresh Greene's recollection in a manner whereby he sought to disclose the contents of the statements to the jury (see, CPL 60.35 [3]).

Through his further testimony, Greene disclosed that he had, in fact, seen a man named Sean run from the cab after he had heard a gunshot, but that that man was not the defendant, whom he did not know. While this testimony

certainly did tend to disprove the People's case, impeachment by the use of Greene's prior statements was still impermissible because Greene's written statement had not been signed and his oral statement had not been sworn (see, CPL 60.35 [1]). The trial court, taking cognizance of this fact, did not permit the prosecutor to place the statements in evidence. However, the prosecutor's repeated questions, in which were contained the substance of Greene's prior statements, served a similar purpose. This conduct was clearly improper (see, People v Wright, 41 NY2d 118; People v Fitzpatrick, supra; People v McNair, 59 AD2d 787; People v Jordan, 59 AD2d 746). Moreover, this impropriety was exacerbated by the trial court's instruction to the jury, wherein it was stated that the jury could use the prosecutor's questions regarding Greene's prior contradictory statements in order to assess Greene's credibility, but not as part of the People's case in chief. However, as previously noted, those statements should not have been used, even for impeachment (see, CPL 60.35 [1]).

Essentially then, in conformity with the CPL, Greene's testimony should only have consisted of his denial that he saw the cab driver being shot. Unfortunately, by virtue of the prosecutor's misconduct, the jury learned that prior to the trial, Greene had told law enforcement officials that he had seen a man named Sean, whom he identified as the defendant, run from the cab immediately after the shot was fired. The prejudice which flowed from this error is self-evident.

The icing was placed on the cake during the course of the prosecutor's summation, in which he commented extensively on Greene's testimony. Specifically, the prosecutor rhetorically asked the jury whether it believed that the People called Greene "[s]o that he could get on the stand and say that this defendant is not the person who committed the crime?" In an attempt to cast doubt on Greene's testimony that the defendant was not the perpetrator, the prosecutor asked another rhetorical question: "If the police had information that someone else committed this crime, why not go out and arrest the real perpetrator of the crime?" Undaunted in the face of the defense counsel's repeatedly-sustained objections, the prosecutor continued: "I submit to you, ladies and gentlemen, that the person that the defendant—that the police arrested was the real perpetrator of that crime, was the Sean that Tarik Greene indicated was the person who committed this crime". This oblique reference to Greene's inadmissible prior statements did not satisfy the prosecutor, who, over objection, then revealed the crux of his argument.

"Was he credible? I submit to you, ladies and gentlemen, that Tarik Greene is more valuable to you as corroboration, corroboration, remember, talking about corroborating the testimony of [Ervin] Charlton which I submit to you is sufficient on its face. But he is more valuable to you as corroboration.

"You can be more confident in the identification by [Ervin] Charlton having heard Tarik Greene say that he was not the Sean that committed the crime after hearing Tarik Greene say that he is not the person who I saw commit this crime. * * *

"I submit to you, ladies and gentlemen, that when Tarik Greene didn't admit at any time during his testimony that he was involved in a burglary on January 28, of 1985, it was more reasonable for you to believe that he was.

"I submit to you that when Tarik Greene didn't admit anything about a VCR, it was more reasonable for you to believe that he knew everything about a VCR.

"When Tarik Greene told you that he saw this incident as he was a passer-by and never admitted that he was in that cab with Charlton and Springer, it is more reasonable for you to believe that he was in that cab, and not just a passer-by.

"In fact, when Tarik Greene took the stand and told you this defendant was not the Sean that he saw commit the crime, it is more than reasonable for you to believe that he was. * * *

"When Tarik Green in response to Mr. Nathanson's question: Is my client the person you saw commit this crime, his response was absolutely not, it is even much more reasonable just in the strength of his conviction of the denial that he was the person, and that he is the person, and that he is the person that committed that crime".

There were several other, albeit less egregious, errors committed during the course of the trial which contributed to depriving the defendant of his right to a fair trial. For example, during the course of his direct examination, Detective Norrito was permitted to testify, over objection, that during the course of his investigation he spoke with Tarik Greene, Anthony Rogers (aka Mousey) and Carlton Springer, and that each imparted certain information to him regarding the incident that occurred on January 28, 1985. The detective then testified that on February 3, 1985, he arrested the defendant. This testimony, which raised the inference that Greene, Rogers and Springer identified the defendant as one of the perpetrators, was improper *(see, People v Dubois,* 137

AD2d 706; *People v Cummings,* 109 AD2d 748, 750; *People v Tufano,* 69 AD2d 826). Moreover, the prosecutor improperly expressed his personal belief that the testimony of the only witness who was able to identify the defendant as the perpetrator, Ervin Charlton, was truthful *(see, People v Bailey,* 58 NY2d 272, 277; *People v Blowe,* 130 AD2d 668, 671; *People v Ortiz,* 125 AD2d 502). The prosecutor improperly stated, during the course of his opening remarks, that Tarik Greene knew the defendant, and then failed to establish that fact at trial *(see, People v Cruz,* 100 AD2d 882). While this may not, in and of itself, warrant reversal, particularly since the defendant's objection thereto was withdrawn *(see, People v De Tore,* 34 NY2d 199, 207, *cert denied sub nom. Wedra v New York,* 419 US 1025), when combined with the prosecutor's direct examination of Greene and his summation remarks regarding Greene, the defendant was clearly prejudiced.

Under the circumstances, the cumulative effect of the foregoing errors requires that the defendant's conviction be reversed and a new trial ordered.

We note that we have examined the remaining contentions raised by the defendant and find them either without merit or more properly raised in a motion pursuant to CPL 440.10. Brown, Eiber and Miller, JJ., concur.

Kunzeman, J., dissents and votes to affirm the judgment appealed from, with the following memorandum, in which Thompson, J. P., concurs. Although the People concede that the prosecutor "made some errors in his questioning of Tarik Greene", it is my view that, under the circumstances of this case, none of the prosecutor's alleged errors warrants reversal. At trial, Greene testified that he had not seen the shooting and specifically denied having told law enforcement officers that he had observed a male, kneeling on the back seat of a taxi cab, holding a gun to the driver's head. The People, in an attempt to refresh Greene's recollection, utilized a tape of his conversation with the prosecutor. Greene conceded that the voice on the tape was his. Greene then testified that his prior statement, regarding his presence in the cab at the time of the shooting and his observation of someone holding a gun to the driver's head, was false. Greene also testified that he had lied when he told the prosecutor that he saw an individual named Sean, who was not the defendant, shoot the cab driver. The trial court designated Greene a hostile witness. The prosecutor was then permitted to question Greene about his previous contradictory statements to Detective Norrito and Assistant District Attorney Lobell.

Significantly, the defense failed to act upon the trial court's offer to entertain a motion for a mistrial based upon the testimony of Tarik Greene. Consequently, the defendant's claim that he is entitled to a new trial now, on the basis of the prosecution's direct examination of Greene, is unpreserved for appellate review (CPL 470.05 [2]; *People v Udzinski,* 146 AD2d 245, 249-252). In fact, after the trial court advised the jurors that the prosecutor's questions regarding Greene's prior contradictory statements were for the limited purpose of impeaching that witness's credibility, the following line of questioning took place without any objection from the defense counsel:

"By [ASSISTANT DISTRICT ATTORNEY]

"Q Now, Mr. Green *[sic],* just so that I'm clear, is it or is it not a fact you spoke to Detective Norito *[sic]* on January 31st of 1985 in relation to the incident of January 28th, 1985? Just that you spoke to him?

"A Yes.

"Q And isn't it also a fact that you spoke to him again on February 3rd, 1985, relative to the incidents of January 28th of 1985?

"A I believe it is.

"Q And isn't it also a fact that you spoke to an Assistant District Attorney by the name of Douglas Lobel *[sic]* on February 4th of 1985, relative to the incident of January 28th of 1985 and what you saw?

"A Yes.

"Q And, Mr. Green *[sic],* isn't it a fact that the person that you saw getting out of the backseat of that cab, just after a shot was fired, was a person who you knew as Sean and who is, in fact, this defendant, this defendant, getting out of the backseat of the cab on January 28th, 1985, just after a shot was fired, at about 8:00 o'clock in the evening?

"A Definitely not.

"[ASSISTANT DISTRICT ATTORNEY]:

"No further questions."

In view of this failure by the defendant to object to the impeachment of the People's own witness, the error is clearly unpreserved and waived *(see, People v Toney,* 132 AD2d 955).

Unlike the majority, I am disinclined to reach this issue on the merits in the exercise of our interest of justice jurisdiction. Nevertheless, upon considering the merits of this unpreserved issue, as the majority has done, I find sufficient basis in the

record to warrant an affirmance of the judgment under review.

Since the People conceded that Greene's prior contradictory statements were neither sworn nor reduced to writing and signed by him, the prosecutor's use of those statements for impeachment purposes was violative of CPL 60.35 (1). However, the existence of such an error does not necessarily mandate a reversal (see, People v Broomfield, 163 AD2d 403). Case law indicates that such an error does not mandate reversal where proof of guilt is overwhelming and the court has issued admonitions to the jurors that the witness' prior inconsistent statements were to be considered for impeachment purposes only (see, People v Rios, 166 AD2d 616; People v Comer, 146 AD2d 794; cf., People v Mitchell, 143 AD2d 147; People v Winchell, 98 AD2d 838, affd 64 NY2d 826).

The proof of guilt in the instant case includes the positive identification testimony of Ervin Charlton, who had been a passenger in the taxi cab and was an eyewitness to the fatal shooting, and the fact that the deceased was killed with a .25 caliber bullet of the type found in the defendant's home. Although Charlton had never seen the defendant before this encounter, he had ample opportunity to observe the defendant at close range during the incident. Charlton's testimony was unequivocal and he never expressed the slightest doubt that the defendant was the perpetrator. The jurors found his testimony to be inherently credible and there is no basis in the record for interfering with that assessment. The scene was amply lit by a streetlight. Moreover, Charlton's description of events leading up to the murder, specifically the sale of the VCR to the decedent, was corroborated by Citibank records which showed a withdrawal of $100 from the decedent's account at a Citibank branch at the corner of Utica and Clarkson Avenues at 7:49 P.M. on January 28, 1985. In view of what I perceive to be the overwhelming evidence of the defendant's guilt, the defendant's unpreserved claim of error regarding the prosecutor's questioning of Tarik Greene does not compel reversal of the judgment of conviction.

The defendant's numerous claims of error surrounding the prosecutor's summation are mostly unpreserved for appellate review by virtue of the defendant's failure to have raised those claims during trial. The sole preserved claim of error pertained to the prosecutor's argument that Greene's denial that the defendant was the shooter in fact indicated that the defendant was the shooter. The prejudicial impact thereof was minimized by the prosecutor's repeated admonitions to the

jurors that their conviction should be based on the testimony of Ervin Charlton rather than that of Tarik Greene. The prosecutor merely indicated that Greene's testimony was one component of the overall evidence which tended to suggest that Charlton's identification testimony was reliable. Moreover, the trial court unequivocally instructed the jurors, at the commencement of the trial, that the jurors could not assume that something was true simply because a question was asked and the witness denied that it was true. Although defense counsel objected to the argument and made a request to charge after the conclusion of the prosecutor's summation, he did not move for a mistrial. Thus, defense counsel's own conduct suggests that the summation did not substantially prejudice him.

By withdrawing his objection to the prosecutor's comment, during his opening statement, that Tarik Greene knew the defendant, the defense counsel did not preserve that issue for review. The claim is, in any event, without merit. It was reasonable for the jurors to infer that Greene knew the defendant and Rogers (a/k/a Mousey) in light of the testimony that Greene ordered the decedent to stop the cab, called out to Mousey and then engaged both the defendant and Mousey in a conversation regarding the VCR. Even if that conclusion were not fairly inferable from the evidence, the prosecutor's statement would not require reversal. As the Court of Appeals has held: "[I]t happens not infrequently that a prosecutor is unable to prove every statement made in his opening especially when he must rely on criminal characters. But the general rule is that, absent bad faith or undue prejudice, a trial will not be undone" *(see, People v De Tore,* 34 NY2d 199, 207, *cert denied sub nom. Wedra v New York,* 419 US 1025).

The defendant's contention notwithstanding, the prosecutor did not improperly bolster the identification testimony of Ervin Charlton via the direct examination of Detective Norrito. Although the prosecutor asked Detective Norrito if he had spoken with Greene, Springer and Mousey, his underlying purpose was to explain why at least two of those witnesses did not testify at the trial. After eliciting the fact that the detective had spoken with those witnesses, the prosecutor asked him if he knew their whereabouts. Not until the end of the prosecutor's direct examination of Detective Norrito did he elicit the information that the detective had arrested the defendant.

Inasmuch as the defendant's remaining contentions are

either unpreserved for appellate review or patently without merit, I vote to affirm the judgment of conviction.